# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE

**CELTIC INSURANCE COMPANY**,

        Plaintiff,

    v.

**TEAM HEALTH HOLDINGS, INC. and AMERITEAM SERVICES, L.L.C.,**

      Defendants.

Civil Action No. _____

## **COMPLAINT**

# TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................1

PARTIES ...........................................................................................................................8

JURISDICTION AND VENUE ........................................................................................9

FACTS .............................................................................................................................10

I.      The Rise of TeamHealth and Outsourced, Out-of-Network Emergency Services ...........10

II.     The Corporate Practice of Medicine in Disguise. .................................................14

III.    TeamHealth's Scheme of Systematic Upcoding and Overbilling. .......................16

        A.      Classic Upcoding:  Billing for More Expensive Services than Were
                Actually Provided. .....................................................................................16

        B.      Billing for Services Provided by a Physician's Assistant as if a Doctor
                Provided the Service. .................................................................................31

        C.      Billing Charges that Are Eight, Nine, or Ten Times the Amount Allowed
                by Medicare. ..............................................................................................33

CLAIMS FOR RELIEF ..................................................................................................35

I.      COUNT I:  RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS
        ACT ("RICO") — 18 U.S.C. § 1962(c) .................................................................35

        A.      The TeamHealth Upcoding Enterprise ......................................................36

        B.      TeamHealth's Pattern of Racketeering Activity ......................................38

        C.      Injury to Celtic ..........................................................................................41

II.     COUNT II:  CONSPIRACY TO VIOLATE RICO — 18 U.S.C. § 1962(d) .........42

III.    COUNT III:  FRAUD — Tennessee Common Law ..............................................43

IV.     COUNT IV:  NEGLIGENT MISREPRESENTATION — Tennessee Common
        Law ........................................................................................................................45

V.      COUNT V:  TENNESSEE CONSUMER PROTECTION ACT .............................48

VI.     COUNT VI: FRAUDULENT INSURANCE ACT — Tennessee Insurance Law ...........50

VII.    COUNT VII: FRAUDULENT INSURANCE ACT, ATTEMPT — Tennessee
        Insurance Law .......................................................................................................53

VIII.   COUNT VIII: UNLAWFUL INSURANCE ACT — Tennessee Insurance Law .............55

IX.     COUNT IX: UNLAWFUL INSURANCE ACT, ATTEMPT — Tennessee
        Insurance Law .......................................................................................................57

X.      COUNT X:  UNJUST ENRICHMENT — Tennessee Common Law .............................58

PRAYER FOR RELIEF ..................................................................................................59

DEMAND FOR JURY TRIAL .......................................................................................60

Plaintiff Celtic Insurance Company ("Celtic"), on personal knowledge as to information within its possession and on information and belief as to all other matters, alleges as follows against Defendants Team Health Holdings, Inc. and AmeriTeam Services, L.L.C. (collectively, "TeamHealth"):

## NATURE OF THE ACTION

1.      In the past seven years, TeamHealth billed over $100,000,000 in fraudulent health insurance claims to Affordable Care Act health insurance plans run by Celtic.  TeamHealth perpetrated this billing fraud by "upcoding" tens of thousands of health insurance claims, then submitting the upcoded claims to Celtic under the names of thousands of unsuspecting doctors who work for TeamHealth.  TeamHealth kept the profits from the fraud that it perpetrated in the doctors' names.  TeamHealth's fraud harmed patients, the doctors who work for it, and Celtic.  It also harmed Affordable Care Act insurance and put upward pressure on healthcare costs for millions of Americans.  In this action, Celtic seeks to protect its members and Affordable Care Act insurance, and recover damages and penalties for TeamHealth's substantial, systematic, and sustained health insurance fraud against Affordable Care Act insurance.

2.      TeamHealth is one of the largest emergency room ("ER") staffing, billing, and collections companies in the United States.  TeamHealth is under investigation by the United States Congress for "surprise billing" and suing patients;[1] is being sued in a qui tam action on behalf of the Centers of Medicare and Medicaid Services for fraudulent upcoding;[2] is being sued by other

---

[1]  *See* Letter from Frank Pallone, Jr., Chairman, H. Comm. on Energy and Commerce, et al. to Leif M. Murphy, TeamHealth CEO, regarding a Congressional investigation into TeamHealth's "surprise billing" practices (Dec. 19, 2019), https://republicans-energycommerce.house.gov/wp-content/uploads/2019/12/TeamHealth.2019.12.19.-Letter-Surprise-Billing.OI-PRESS.pdf.

[2]  *See United States ex rel. Hernandez v. Team Health, Inc.*, No. 2:16-CV-00432-JRG, 2020 WL 731446 (E.D. Tex. Feb. 13, 2020) (order denying TeamHealth's motion to dismiss).

health insurance companies for fraudulent upcoding;[3] and is being sued in a class action for sending fraudulent bills to patients.[4]

3.     TeamHealth has submitted more than 250,000 health insurance claims to Celtic in the past seven years.  Celtic is an insurance company that offers Affordable Care Act health insurance in 20 states.  Celtic has determined that a material portion of those 250,000-plus health insurance claims were fraudulently upcoded, meaning TeamHealth submitted insurance claims for more expensive services than its doctors and physician's assistants actually provided to Celtic's members.

4.     TeamHealth's business model is to convince hospitals to replace local ER practice groups with TeamHealth's national outsourcing enterprise.  TeamHealth then staffs the emergency departments with ER doctors and physician's assistants under contract with TeamHealth (hereinafter "healthcare contractors"), and it bills insurance companies and patients for the services that its healthcare contractors provide.

5.     After TeamHealth's healthcare contractors provide a service to a patient, an administrative group at TeamHealth's corporate offices creates a health insurance claim by converting the medical record created by TeamHealth's healthcare contractors into a health insurance claim.  Then TeamHealth sends the claim to an insurance company, if applicable, or to

---

[3] *See*, *e.g.*, UnitedHealth Group's counterclaim in *Emergency Care Services of Pennsylvania et al. v. UnitedHealth Group et al.*, Case No. 5:20-cv-5094 (E.D. Pa.), ECF No. 37 (explaining that TeamHealth engaged in upcoding on health insurance claims that TeamHealth submitted to United).

[4] *See* Class Action Complaint in *Fraser v. Team Health Holdings, Inc.*, Case No. 20-4600, at ¶ 6 (N.D. Cal. July 10, 2020) ("The TeamHealth Fraudulent Billing Enterprise maximizes its profits by sending fraudulent bills to patients for the care they receive from TeamHealth physicians. TeamHealth has inflated the rates it charges patient-consumers far above those that it knows it is legally entitled to collect from those patients.").

CMS or the patient. TeamHealth's healthcare contractors on the front-line do not see the insurance claims that TeamHealth creates, even though the claim is submitted in their name. Nor do TeamHealth's front-line healthcare workers receive the money that TeamHealth collects on its health insurance claims—TeamHealth requires the money to be sent directly to TeamHealth. For the most part, TeamHealth classifies its doctors and physician's assistants as "independent contractors" and pays them a fixed hourly fee. Using this scheme, TeamHealth is able to keep most of the money that its doctors and physician's assistants generate.

6. Insurance companies do not see the medical records generated by TeamHealth's healthcare contractors. Instead, TeamHealth typically only sends medical billing codes and minimal other data to insurance companies, like Celtic. This information asymmetry is ripe for fraud, and TeamHealth has exploited it.

7. In the past seven years, TeamHealth has submitted over 250,000 health insurance claims to Celtic. Celtic has paid TeamHealth's claims in reliance on the medical billing codes submitted by TeamHealth. TeamHealth has systematically inflated the medical billing codes on a large portion of the insurance claims that it submitted to Celtic by using three schemes.

8. **_First_, TeamHealth systematically engages in classic medical "upcoding."** In the healthcare provider industry, an illegal profit-maximization strategy is to "upcode" medical billing codes on health insurance claims. Upcoding is billing for a more expensive medical service than actually was provided. By upcoding, a healthcare provider like TeamHealth can inflate its health insurance claims and receive more money. Evidence shows that TeamHealth systematically engages in this illegal practice.

9. Medical claims coding is the process of converting medical records into standardized medical codes for billing purposes. These standardized codes are then used to bill

3

for medical services. Medical billing codes are referred to as Current Procedural Terminology ("CPT") codes. Once TeamHealth takes over a local hospital's ER department, TeamHealth handles all of the medical coding work for the ER department, and TeamHealth submits the codes to insurance companies as health insurance claims.

10. TeamHealth systematically upcodes health insurance claims that it submits to Celtic, using higher medical billing codes than appropriate for the services provided. TeamHealth keeps the excess collections for itself as corporate profits; the doctors and physician's assistants who actually performed the work do not receive the excess payments because, in general, they are paid a fixed hourly rate.

11. TeamHealth's fraud was discovered in separate litigation, when Celtic moved to compel medical records from TeamHealth associated with a subset of the health insurance claims that TeamHealth put at issue in that case. TeamHealth resisted Celtic's request that TeamHealth produce actual medical records—but the court ordered TeamHealth to produce them. Celtic reviewed a sample of the medical records, and determined that TeamHealth systematically upcoded health insurance claims that TeamHealth billed at the highest and most expensive ER code.[5] Celtic determined that TeamHealth billed routine services that TeamHealth's healthcare contractors provided at the highest ER medical billing codes—99285 and 99284—even when the patients required only straightforward and brief treatment or monitoring. For example, patients complaining of headaches, fevers, bug bites, and other relatively minor symptoms resulted in health insurance claims billed at the most expensive ER billing codes.

12. Similarly, one of Celtic's affiliates recently received and reviewed more than 10,000 of TeamHealth's medical records associated with health insurance claims that TeamHealth

---

[5] ER billing codes are described in detail *infra* note 25.

billed at the highest ER medical billing codes. Celtic's affiliate concluded that TeamHealth had "upcoded" nearly two-thirds of the health insurance claims associated with those 10,000-plus medical records.

13.     Health insurance claims data from the past 12 months illustrate the abnormal distribution of medical billing codes submitted by TeamHealth: other ER service providers typically bill Celtic the most-expensive ER billing code less than 30% of the time, while TeamHealth bills Celtic the most-expensive billing code 48% of the time.

14.     TeamHealth has also billed Celtic for ER "critical care" CPT codes that are not warranted—and it has billed those codes at an unjustifiably high rate. Critical care CPT codes are reserved for rare situations in which there is a high probability of sudden, clinically significant, or life-threatening deterioration in the patient's condition, which requires the highest level of physician preparedness to intervene urgently. Critical care codes command a higher payment than even the most expensive standard ER code. TeamHealth has been sued for upcoding standard ER services to "critical care" billing codes in a qui tam case described below. In that case, a whistleblower detailed internal emails and presentations by TeamHealth executives encouraging TeamHealth employees to bill critical care codes:

> "Just a reminder to **keep up the critical care billing!** Abnormal vital signs, ICU admits, blood transfusions, trauma activations, and IV ggts all warrant critical care. We are still missing some obvious opportunities . . . ."[6]

---

[6] As explained in the qui tam complaint, very few situations meet the CMS definition for "critical care," and CMS requires individualized assessment of each presenting condition to see whether it fulfills the criteria for critical care. *See* Second Amended Complaint at ¶¶ 8, 128, *United States ex rel. Hernandez v. Team Health, Inc.* (No. 2:16-CV-00432-JRG), 2020 WL 731446 (E.D. Tex. Sept. 19, 2019).

5

15.     TeamHealth's upcoded health insurance claims have caused Celtic to substantially overpay TeamHealth for services performed by its doctors and physician's assistants. By upcoding, TeamHealth has submitted thousands of fraudulent insurance claims to Celtic, resulting in substantial overpayments from Celtic that TeamHealth secured through fraud. This fraud is ongoing.

16.     ***Second*, TeamHealth systematically bills for services provided by physician's assistants as if the service were provided by a doctor.** Medicaid, Medicare, and private health insurance companies generally pay less for services provided by physician's assistants than for services provided by doctors. Of the 250,000-plus health insurance claims that TeamHealth submitted to Celtic, TeamHealth represented to Celtic that one of its doctor-contractors performed the service nearly 100% of the time. An analysis of millions of ER insurance claims, however, shows that normally a doctor provides ER services only 82% of the time, and a physician's assistant provides the ER service the remaining 18% of the time.[7]

17.     In separate litigation, Celtic moved to compel and received medical records from TeamHealth for a subset of the health insurance claims that TeamHealth submitted to Celtic. Based on Celtic's review of those medical records, Celtic determined that TeamHealth regularly submitted claims to Celtic indicating that one of TeamHealth's doctor-contractors provided the service to the member, when in fact one of its physician's assistants did. By making these misrepresentations to Celtic, TeamHealth has submitted thousands of fraudulent insurance claims to Celtic, resulting in substantial payments from Celtic at "doctor rates" that TeamHealth secured through fraud. This fraud is ongoing.

---

[7] *See* https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier (CMS payment data).

18.     ***Third***, **TeamHealth uses an out-of-network strategy to try to collect many times the amount owed for the services that its healthcare contractors provide.**  The harm from TeamHealth's upcoding schemes is exacerbated because TeamHealth uses an "out-of-network strategy" in an effort to collect its sticker price rates, otherwise known as "billed charges," on its upcoded claims.  TeamHealth sets these billed charges at amounts that often are seven, eight, or nine times the amount described in the ACA regulations for the relevant services.[8]

19.     Because TeamHealth acts as an intermediary between its healthcare contractors and insurance companies, TeamHealth decides whether its healthcare contractors will be "in-network" with a particular insurance plan, or operate without a contract with the insurance company and thus be "out-of-network."  To maximize profits, TeamHealth often pursues an "out-of-network strategy," opting not to contract with insurance companies at reasonable rates, and instead trying to bill for extremely high "billed charges," which TeamHealth unilaterally sets.  TeamHealth uses these exorbitant billed charges to inject inappropriate costs into the healthcare system, and it has even sued patients and insurance companies to collect on these exorbitant charges, which bear no resemblance to the cost of providing the service.  TeamHealth often uses the threat of litigation to attempt to squeeze more out of insurance plans like the Affordable Care Act insurance plans offered by Celtic.

20.     TeamHealth's billing schemes demonstrate the risk of allowing national outsourcing companies like TeamHealth to take over local doctor-run ER departments.  Because of this risk, many states bar corporations from practicing medicine or employing physicians.

---

[8]  The Affordable Care Act anticipated that people with ACA insurance would from time-to-time see out-of-network ER providers.  The ACA regulations require that ACA insurance pay out-of-network ER providers no less than the "greatest of three" different measures: (i) the amount paid to in-network ER providers; (ii) the amount typically paid to out-of-network ER providers; or (iii) the amount paid by Medicare.  29 C.F.R. § 2590.715–2719A(b)(3).

TeamHealth has created a complex corporate structure in an effort to avoid these laws and disguise its actions. TeamHealth's actions exploit the risks that the laws were designed to avoid.

21. The higher payments that TeamHealth has extracted through its billing schemes create upward pressure on insurance premiums and can result in high out-of-pocket costs for patients. This case involves Affordable Care Act insurance, which is designed for those who often cannot afford traditional health insurance. TeamHealth's upcoding schemes harm patients, Celtic and its members, and taxpayers.[9]

## PARTIES

22. Plaintiff Celtic Insurance Company ("Celtic" or "Plaintiff") offers health insurance pursuant to the Affordable Care Act, and it pays insurance claims submitted by providers under those policies. Celtic is a subsidiary of Centene Corporation ("Centene"), a publicly traded health insurance company that focuses on providing affordable insurance to uninsured, under-insured, and low-income individuals. Centene provides insurance through government-subsidized programs such as Medicare, Medicaid, and the Affordable Care Act. Celtic is an Illinois corporation, with its principal place of business in Illinois, and is therefore a citizen of Illinois.

23. Defendants are a system of affiliated entities operating as and collectively referred to herein as "TeamHealth." TeamHealth is owned by a large private equity firm. That private equity firm acquired TeamHealth in 2017 for $6.1 billion. TeamHealth primarily provides emergency room staffing and administrative services to hospitals through a network of subsidiaries, affiliates, and independent contractors, which operate in 47 states and which

---

[9] Certain of TeamHealth's affiliates sued Celtic regarding health insurance claims, and Celtic filed counterclaims against those affiliates, in Arkansas, Mississippi, Georgia, and Florida. With regard to the subset of insurance claims that are within the scope of those other cases, Celtic's damages in this case may be reduced by Celtic's recovery in those other cases.

TeamHealth refers to as the "TeamHealth System." TeamHealth designed the complex structure of the TeamHealth System to avoid state laws that prohibit general business corporations from practicing medicine, employing doctors, controlling doctors' medical decisions, and/or splitting professional fees with doctors (known as the "corporate practice of medicine").

24. Defendant Team Health Holdings, Inc. is a Delaware corporation with its principal place of business at 265 Brookview Centre Way, Suite 400, Knoxville, Tennessee 37919 and is therefore a citizen of Delaware and Tennessee.

25. Defendant AmeriTeam Services, L.L.C. is a Tennessee Limited Liability Company. Its sole member is Team Finance L.L.C., whose sole member is Team Health Holdings, Inc. AmeriTeam Services, L.L.C. employs the executive officers and administrative leaders of TeamHealth; issues the policies that govern all TeamHealth entities, in conjunction with its ultimate parent, Team Health Holdings, Inc.; and provides operational direction and administrative and support services to all TeamHealth entities. Its principal place of business is at 265 Brookview Centre Way, Suite 400, Knoxville, Tennessee 37919. Because AmeriTeam Services, L.L.C. takes the citizenship of its sole member's sole member, Team Health Holdings, Inc., it is likewise a citizen of the States of Delaware and Tennessee.

26. Because the misconduct at issue in this case is the result of policies and practices issued, directed, and overseen by both Defendants jointly, and because both Defendants jointly control the "TeamHealth system," this Complaint refers to both Defendants collectively as "TeamHealth."

## JURISDICTION AND VENUE

27. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(a) because Celtic's claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq., arises under federal law. This Court also

9

has supplemental subject matter jurisdiction over Celtic's state-law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to Celtic's federal-law RICO claim that they form part of the same case or controversy.

28.     Additionally and in the alternative, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendants are completely diverse:  Plaintiff is a citizen of Illinois, and Defendants are citizens of Delaware and Tennessee.  The amount in controversy exceeds $75,000.

29.     Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965(a) because TeamHealth resides, is found, has agents, and transacts its affairs in this district.  Venue is also proper under 28 U.S.C. § 1391(b)(1) and (2) because TeamHealth resides in this district and because events giving rise to this Complaint took place within this district.

## FACTS

### I.     The Rise of TeamHealth and Outsourced, Out-of-Network Emergency Services

30.     TeamHealth's business model is to convince local hospitals to "outsource" their emergency departments to TeamHealth.  TeamHealth then staffs those emergency departments with doctors and physician's assistants who work for TeamHealth as "independent contractors." TeamHealth acts as an intermediary or gatekeeper between these healthcare contractors and the insurance companies that pay for their services.

31.     By acting as an intermediary, TeamHealth gets to bill for services performed by its healthcare contractors.

32.     TeamHealth's business model of being an intermediary between doctors and insurance companies causes doctors to be paid less.  TeamHealth requires that all payments be sent directly to TeamHealth's corporate enterprise—and TeamHealth keeps most of the payments. TeamHealth generally compensates its healthcare contractors at a fixed hourly rate that does not

10

vary with the amount of excess payments TeamHealth extracts through its fraudulent billing schemes.

33.     TeamHealth has blocked Celtic's attempt to negotiate with and enter into agreements directly with the front-line ER doctors who provide services to Celtic's members. Such agreements likely would result in more compensation going directly to the front-line ER doctors and medical workers for services they provide to Celtic's members.

34.     TeamHealth uses a variety of schemes to inflate its bills, and then it aggressively collects on its bills.

35.     Because TeamHealth controls whether its healthcare contractors are in-network or out-of-network, its individual healthcare contractors cannot decide that question for themselves, and they have no say in how much TeamHealth bills for their services. Thus, TeamHealth—and TeamHealth alone—is the controlling intermediary between its healthcare contractors, on the one hand, and health insurance companies and patients, on the other.

36.     TeamHealth's business model has generated significant profits. Over the past four decades, TeamHealth has grown dramatically by acquiring other staffing/billing companies focused primarily on emergency services. It has become "one of the largest suppliers of outsourced healthcare professional staffing and administrative services to hospitals and other healthcare providers in the United States."[10]   TeamHealth now operates nationwide, claiming to control hospital ER departments in 47 states, and employing more than 18,000 healthcare contractors.[11]

---

[10]  TeamHealth Annual Report (Form 10-K) (Feb. 22, 2016), https://www.sec.gov/Archives/edgar/data/1082754/000108275416000054/tmh-201510k.htm.

[11] *Id.*

37.     When TeamHealth takes over a hospital's emergency department, it demands to negotiate with insurance companies directly—without involving the hospital in which TeamHealth is working. TeamHealth often opts to be "out-of-network" with an insurance company, even when the hospital where its doctors work is in-network. TeamHealth is able to do this without reducing the volume of patients treated by its doctors, because patients typically do not select their ER doctors or know that the ER doctor may be out-of-network, especially when the ER doctor works at an in-network hospital. As a result, TeamHealth can refuse to join an insurer's network, and can charge higher out-of-network rates with little risk of losing business. TeamHealth can in turn use the threat of staying out-of-network to demand that an insurance company pay higher rates to have TeamHealth's doctors in-network.

38.     According to a recent study on out-of-network ER physicians: "[W]hen TeamHealth receives a new hospital contract, physicians working for the firm go out-of-network for several months and then rejoin[s] networks while using the now credible threat of out-of-network status to secure higher in-network payments."[12] The study found that when TeamHealth rejoins the network, it receives in-network rates that are 68% higher than they were before TeamHealth took over the ER department.[13]

39.     As a result of its strategy, TeamHealth extracts from private insurers on average 364% of the rates allowed by Medicare.[14] For comparison, the same study found that in-network ER departments typically receive on average 266% of the Medicare rates, internists 158% of

---

[12]  Zack Cooper, et al., *Surprise! Out-of-Network Billing for Emergency Care in the United States*, at 4–5, 23 (Dec. 2018).

[13]  *Id.* at 36.

[14]  *Id.* at 25.

Medicare rates, and orthopedists 178% of Medicare rates.[15]  Each year, the Centers for Medicare & Medicaid Services ("CMS") revises its Medicare fee schedule, which is a schedule of payments that Medicare pays for each CPT code.  The Medicare fee schedule is a widely used benchmark for payments in the healthcare industry.

40.    Instead of leaving and then rejoining an insurance company's network, TeamHealth may instead choose to stay out-of-network, and bill extremely high "billed charges"—often 800%, 900%, or 1000% the rate allowed by Medicare—and then attempt to collect those high charges from patients and insurance companies.

41.    When TeamHealth is out-of-network, the insurer almost never pays TeamHealth's "billed charges" in full because those charges are not commercially reasonable and are often ten or more times the cost of the service performed by TeamHealth's healthcare contractor.  After collecting a portion of its "billed charges" from the insurance company, TeamHealth may then try to collect from the patient the difference between TeamHealth's "billed charges" and the insurer's payment.  The patient—who likely did not even know that the ER doctor or physician's assistant worked for TeamHealth and was out-of-network—then receives a "surprise bill" for emergency services from one of TeamHealth's affiliates.

42.    When sending bills or providing services, TeamHealth usually does not use its name; instead, it uses the names of its doctors or one of dozens of affiliates, most of which do not carry the TeamHealth name.  Because TeamHealth uses many different entities and names to carry out its billing scheme, it has been able to mask the enormity of its enterprise and the sheer number of times it has carried out this scheme.

---

[15] *Id.*

43.     TeamHealth has aggressively pursued litigation against patients who are unable to pay TeamHealth's extremely high "billed charges."   For example, between 2017 and 2019, TeamHealth filed more than 4,800 lawsuits against patients in Tennessee state courts.[16] TeamHealth has also sued thousands of patients in other states.  And TeamHealth has filed 38 lawsuits since 2018 against health insurance companies, demanding higher payments for out-of-network services rendered by TeamHealth healthcare contractors.[17]  To protect its out-of-network "surprise billing" scheme, TeamHealth has funded a front group that spent $28 million on lobbying against legislation that would protect patients from TeamHealth's surprise bills.[18]

44.     The collateral damage caused by TeamHealth's efforts to maximize profits under its business model is higher healthcare costs for Americans in the form of higher insurance premiums, increased member cost-sharing, more tax subsidies, and thousands of lawsuits clogging the court system and jeopardizing the finances of American families.

## II.     The Corporate Practice of Medicine in Disguise.

45.     TeamHealth structures its business operations to support its profit-maximizing strategy while disguising its participation in the corporate practice of medicine.  The corporate practice of medicine doctrine "prohibits corporations from practicing medicine or employing a

---

[16]  Wendi C. Thomas, et al., *A Private Equity-Owned Doctors' Group Sued Poor Patients Until It Came Under Scrutiny*, Nat'l Pub. Radio (Nov. 27, 2019), https://www.npr.org/sections/health-shots/2019/11/27/783449133/a-private-equity-owned-doctors-group-sued-poor-patients-until-it-came-under-scru.

[17]  Isaac Arnsdorf, *How Rich Investors, Not Doctors, Profit from Marking Up ER Bills*, ProPublica, (June 12, 2020), https://www.propublica.org/article/how-rich-investors-not-doctors-profit-from-marking-up-er-bills.

[18]  Margot Sanger Katz et al.*, Mystery Solved: Private-Equity-Backed Firms Are Behind Ad Blitz on "Surprise Billing."* N.Y. Times (Sept. 13, 2019), https://www.nytimes.com/2019/09/13/upshot/surprise-billing-laws-ad-spending-doctor-patient-unity.html.

physician to provide professional medical services."[19]  This rule promotes doctors working for themselves or with other doctors.  It is intended to safeguard against the "commercialization of the practice of medicine," a divergence between a company's obligations to maximize profits for shareholders and a physician's obligations to patients.[20]  At bottom, the corporate practice of medicine risks putting financial incentives above patient care.

46.    TeamHealth tries to circumvent state laws banning the corporate practice of medicine by creating and maintaining a large number of subsidiaries with various names.[21] TeamHealth owns and operates a number of regional corporations, which in turn own subsidiary companies that employ physicians, often purportedly as "independent contractors."  TeamHealth, the corporation, thus avoids directly employing doctors.  In Texas, for instance, doctors working for TeamHealth are independent contractors to a professional association or P.A., which is affiliated with TeamHealth but purportedly is owned by a doctor.[22]  But, according to one report, that doctor is in fact an executive at TeamHealth whom the company can remove and replace at any time.[23]

47.    At its headquarters, TeamHealth handles all of the medical coding and billing for work performed by its healthcare contractors around the country, and it does so using uniform procedures across the enterprise designed to maximize revenue.  It centrally controls its healthcare

---

[19]  *Issue Brief: Corporate Practice of Medicine*, Am. Med. Ass'n (2015), https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/premium/arc/corporate-practice-of-medicine-issue-brief_1.pdf.

[20]  *Id.*

[21]  Arnsdorf, *supra* note 17.

[22]  *Id.*

[23]  *Id.*

contractors nationwide by setting procedures for their work, dictating when and how much they work, and determining what its healthcare contractors are paid, which usually is a fixed hourly rate. And TeamHealth centrally decides what "code" to assign and how much to bill for its healthcare contractors' services.

48.     When TeamHealth's healthcare contractors complete their work with a patient, they submit medical records to TeamHealth's headquarters, where the next step of TeamHealth's scheme occurs: upcoding, overbilling, and aggressively collecting money beyond what is owed.

## III.     TeamHealth's Scheme of Systematic Upcoding and Overbilling.

49.     TeamHealth has systematically inflated health insurance claims that it has submitted to Celtic over the past seven years through various schemes: classic upcoding; billing for services by physician's assistants under a doctor's name; and billing for services at a price that is eight, nine, or ten times the price allowed by Medicare.

### A.     Classic Upcoding:  Billing for More Expensive Services than Were Actually Provided.

50.     Coding is the process of converting a medical record into a billing code that accurately describes the medical service provided. Billing codes are used by insurance companies and CMS to pay for medical services. Standardized health care billing codes are called Current Procedural Terminology ("CPT") codes. TeamHealth determines what CPT code to bill and sends claims containing these codes to insurance companies and CMS when TeamHealth seeks payment for services. When seeking payment for services, TeamHealth typically does not provide actual medical records to insurance companies or CMS. Instead, TeamHealth makes a representation to the insurance company or CMS that the CPT codes accurately describe the service provided by the TeamHealth contractor.

16

51.     Upcoding occurs when a healthcare provider submits a health insurance claim with a CPT code that corresponds to a more expensive service than was actually provided.  The higher code triggers a greater payment.  Upcoding is health insurance fraud.[24]

52.     Emergency medical services are typically billed using one of five CPT codes: 99281, 99282, 99283, 99284, and 99285, with the last digit representing the level of severity.[25]

---

[24] Medical Learning Network, *Medicare Fraud & Abuse: Prevent, Detect, Report* (Feb. 2019), https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/Fraud-Abuse-MLN4649244.pdf.

[25] CPT Codes 99281–99285 are used to "code" and bill standard emergency department services.  CPT Codes 99291–99292 are used to code and bill "critical care" ER services. American Medical Association, *CPT 2020 Professional Edition* 22-23 (Mark S. Synovec et al. eds., 2020) (content also available at https://www.ama-assn.org/system/files/2020-05/telehealth-services-covered-by-Medicare-and-included-in-CPT-code-set.pdf).

- CPT Code 99281 emergency department visits include "[a] problem focused history; [a] problem focused examination; and [s]traightforward medical decision making. . . . Usually, the presenting problem(s) are self limited or minor."  *Id.* at 22.

- CPT Code 99282 emergency department visits include "[a]n expanded problem focused history; [a]n expanded problem focused examination; and [m]edical decisionmaking of low complexity. . . . Usually, the presenting problem(s) are of low to moderate severity." *Id.*

- CPT Code 99283 emergency department visits include "[a]n expanded problem focused history; [a]n expanded problem focused examination; and [m]edical decision making of moderate complexity. . . . Usually, the presenting problem(s) are of moderate severity." *Id.* at 23.

- CPT Code 99284 emergency department visits include "[a] detailed history; [a] detailed examination; and [m]edical decision making of moderate complexity. . . . Usually, the presenting problem(s) are of high severity, and require urgent evaluation by the physician, or other qualified health care professionals but do not pose an immediate significant threat to life or physiologic function."  *Id.*

- CPT Code 99285 emergency department visits include "[a] comprehensive history; [a] comprehensive examination; and [m]edical decision making of high complexity. . . . **Usually, the presenting problem(s) are of high severity and pose an immediate significant threat to life or physiologic function**."  *Id.* (emphasis added).

17

CPT code 99281 indicates the least severe level of ER service, while CPT code 99285 represents the most severe level. CPT code 99285 is reserved for emergencies that pose an immediate significant threat to life or physiological function. CPT codes 99291 and 99292 represent "critical care," accounting for the very small fraction of ER visits each year[26] that require a physician's undivided attention to a single patient to mitigate one or more vital organ system failures.[27]

53.     A central administrative group at TeamHealth's corporate offices in Alcoa, Tennessee handles the "coding." They take the medical records generated by TeamHealth's healthcare contractors, and they decide what CPT code to bill for the work performed. After reviewing the medical record generated by the healthcare contractor, a TeamHealth "coder" assigns one of the CPT codes. TeamHealth then submits the codes to insurance companies, including Celtic, as an insurance claim.

54.     TeamHealth's coders are administrative employees hired and trained by TeamHealth; they are not ER doctors and most have no medical training.

---

- Critical Care CPT Code 99291 denotes the first 30-74 minutes of care for "the critically ill or critically injured patient," *id.*, who suffers from "[an] acute[] impair[ment of] one or more vital organ systems such that there is a high probability of imminent or life threatening deterioration in the patient's condition," Medicare Claims Processing Manual at Ch. 12, § 30.6.12(A) (https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/clm104c12.pdf). Critical care demands "high complexity decision making." *Id.* A provider must report as "[t]he duration of critical care . . . the time the physician spent evaluating, providing care [for] and managing the critically ill or injured patient[]" in the patient's immediate vicinity. *Id.* at § 30.6.12(C). For any period of critical care, the physician "must devote his or her full attention to the patient." *Id.*

- Critical Care CPT Code 99292 marks each subsequent 30 minutes of critical care of the same kind as 99291. Synovec et al. at 22–23.

[26] https://www.cdc.gov/nchs/fastats/emergency-department.htm (ER statistics).

[27] Medicare Claims Processing Manual at Ch. 12, § 30.6.12(A).

18

55.     TeamHealth's front-line doctors and physician's assistants do not see the code selected by TeamHealth's coders, nor do the front-line workers see the insurance claim or billed amount submitted by TeamHealth.  They have no idea how TeamHealth bills their services—or for how much—even though the bills often are submitted in their names.  They are not involved in assigning codes to the services they provide, and they are not consulted regarding what code should be billed.[28]

56.     In a recent deposition, Dr. Hamilton Lempert, TeamHealth's head of coding policy, explained that the company does not trust its front-line healthcare contractors to assign billing codes.[29]  Dr. Lempert confirmed that, during the coding process, coders do not discuss the medical records or coding with the front-line healthcare contractor.[30]  Instead, the coder relies on his or her own judgment and TeamHealth's policies in converting medical records into billing codes.  The doctor or physician's assistant who provided the service has no input on what billing code is assigned to the service.

57.     One of TeamHealth's healthcare contractors described the situation in a statement to the press:

> **"As an emergency medicine physician, I have absolutely no idea to whom or how much is billed in my name.**  I have no idea what is collected in my name.  This is not what I signed up for and this isn't what most other ER docs signed up for.  I went into medicine to lessen suffering, but as I understand more clearly my role as an employee of TeamHealth, I realize that I'm unintentionally worsening some patients' suffering."[31]

---

[28]  Lempert Dep., 42:8-11.

[29]  Lempert Dep., 37:4-38:2.

[30]  Lempert Dep., 42:8-11.

[31]  Arnsdorf, *supra* note 17 (emphasis added).

19

58.     When TeamHealth bills insurance companies, TeamHealth almost never includes medical records showing what service was actually provided.  Therefore, an insurance company cannot compare the codes on the health insurance claims to documentation regarding the service provided.  TeamHealth makes representations that the codes on the health insurance claims accurately describe the service provided, without giving the insurer medical records that could be used to verify those representations.

59.     Because of the large volume of claims submitted every day and the laws prohibiting health insurance fraud, the insurance industry reasonably relies on TeamHealth's representations.

60.     In accordance with its usual practice, TeamHealth has submitted hundreds of thousands of health insurance claims to Celtic without including the underlying medical records.  Celtic paid TeamHealth's claims for ER services in reliance on TeamHealth's representations on the health insurance claims.

61.     A review of recently acquired medical records from TeamHealth shows that TeamHealth has routinely "upcoded" health insurance claims that it has submitted to Celtic's Affordable Care Act insurance plans.  Celtic discovered TeamHealth's upcoding on Celtic ACA claims in the course of defending against litigation that TeamHealth initiated against Celtic in Arkansas.  In that case, TeamHealth was demanding higher payments from Celtic for its ER services, but TeamHealth refused to provide the medical records showing what services its healthcare contractors actually performed.  In June 2020, the Arkansas court ordered TeamHealth to produce the medical records to Celtic.

62.     In July 2020, Celtic reviewed a sample of the medical records produced by TeamHealth for insurance claims that TeamHealth billed at the highest severity level.  A spreadsheet detailing the results of Celtic's review is attached as EXHIBIT 1.  Celtic's review

20

exposed a systematic pattern of upcoding by TeamHealth. TeamHealth systematically assigned the highest ER code, 99285—a code reserved for conditions that immediately threaten life or physiological function—to claims where the patient reported complaints like headaches, flu-like symptoms, fever, aches, bug bites, or anxiety. TeamHealth billed 100% of those health insurance claims under a doctor's name.

63. Celtic's expert in that case concluded that a material portion of TeamHealth's health insurance claims were upcoded:

> "[M]y team randomly selected a probe sample of 30 of the medical bills at issue that [TeamHealth] coded with CPT code 99285 for review. [A] Certified Professional Coder, Certified Outpatient Coder and Certified Risk Adjustment Coder on my team, has now reviewed the remaining medical records provided by [TeamHealth] that allegedly support these 30 randomly selected medical bills. She had the following findings based on her review of documentation available to her to date:
>
> - **Documentation reviewed did not always support a face-to-face encounter with the physician when the ED [Emergency Department] team included a non-physician practitioner**;
>
> - One of the 30 medical records could not be evaluated due to a missing physician visit note;
>
> - **18 of the 29 medical records reviewed did not support the CPT code that appeared on the medical bill;**
>
> - **The 18 medical bills that were "upcoded" represent 62% of the medical bills reviewed containing CPT code 99285;**
>
> - 13 of the 18 "upcoded" medical bills should have been assigned CPT code 99284;
>
> - Five of the 18 "upcoded" medical bills should have been assigned CPT code 99283;
>
> - 11 of the 29 reviewed medical bills were correctly assigned CPT code 99285."
>
> See *Southeastern Emergency Physicians v. Arkansas Health & Wellness et al.*, Case No. 17-cv-00492-BSM (E.D. Arkansas), Dkt No. 204-2 (emphasis added).

21

64.     Celtic's expert concluded that many of the medical records did not support the billing code that TeamHealth submitted on its health insurance claims.  For example:[32]

- On April 25, 2015, a doctor under contract with TeamHealth saw a patient who complained of "abdominal pain." **The notes reflect that the "patient has been re-examined and the patient has been informed of all results and diagnosis. The patient is ready for discharge." The patient was instructed to follow up "with PCP [primary care physician] if not improving and to return to ED for any acute worsening."** TeamHealth submitted a health insurance claim to Celtic for this work on claim # 149655068/400.  TeamHealth billed this work as CPT Code 99285, the highest-severity ER code.  TeamHealth listed the billed charge as $1,255.00, about 8 times what Medicare would pay for this work, and about 6.5 times what ACA insurance would pay for this work.

  Celtic's expert determined—upon review of the medical record associated with the claim—**that this claim should have been billed as CPT code 99284**.  The difference between the amounts paid for a 99285 claim and a 99284 claim is material, and adds up to tens of millions of dollars across tens of thousands of claims.

- On December 21, 2016, a nurse under contract with TeamHealth saw a patient who **complained of a "headache that began this morning." The patient's husband "states she feels this way because she took too much xanax today." The nurse's notes reflect that the patient "states her headache is improved" and was discharged and "instructed to return immediately with any worsening symptoms, otherwise call and schedule appointment for follow up with PCP [primary care physician] as soon as possible."** TeamHealth submitted a health insurance claim to Celtic for this work on claim # 179526660/400.  TeamHealth submitted this claim under a doctor's name, even though the medical records show that **no doctor saw the patient**.[33] TeamHealth billed this work as CPT Code 99285, the highest-severity ER code.  TeamHealth listed the billed charge as $1,384.00, about 8 times what Medicare would pay for this work, and about 6.5 times what ACA insurance would pay for this work.

  Celtic's expert determined—upon review of the medical record associated with the claim—**that this claim should have been billed at most as CPT code 99284**.  The difference between the amounts paid for a 99285 claim and a 99284

---

[32]  For privacy reasons, the medical records described herein are not attached as exhibits to this Complaint.  For detail on all 30 records in the expert's review, see EXHIBIT 1.

[33]  The fact that no doctor saw the patient associated with claim # 179526660/400 also is relevant to TeamHealth's second billing fraud: billing physician's assistants under a doctor's name.  *See infra* Section III.B.

claim is material, and adds up to tens of millions of dollars across tens of thousands of claims.

- On April 3, 2017, a nurse under contract with TeamHealth saw a patient who **complained of "lower abdominal and pelvic pain, described as cramping, that began 3 nights ago." The nurse's notes in the medical record reflect: "Today, feels mild dull ache but pain is gone." The nurse's notes reflect that the patient "wants to go home,"** and was instructed to "call and schedule appointment for follow up with PCP [primary care physician] as soon as possible." TeamHealth submitted a health insurance claim to Celtic for this work on claim # 185326043/400. TeamHealth submitted this claim under a doctor's name, even though the medical records show that **no doctor saw the patient**.[34] TeamHealth billed this work as CPT Code 99285, the highest-severity ER code. TeamHealth listed the billed charge as $1,384.00, about 8 times what Medicare would pay for this work, and about 6.5 times what ACA insurance would pay for this work.

  Celtic's expert determined—upon review of the medical record associated with the claim—**that this claim should have been billed as CPT code 99284**. The difference between the amounts paid for a 99285 claim and a 99284 claim is material, and adds up to tens of millions of dollars across tens of thousands of claims.

- On July 13, 2017, a doctor under contract with TeamHealth saw a patient who **complained of "abdominal pain." The notes reflect that "pt [patient] was reassured" and was told to "return with increased pain or problems."** TeamHealth submitted a health insurance claim to Celtic for this work on claim # 191102925/400. TeamHealth billed this work as CPT code 99285, the highest-severity ER code. TeamHealth listed the billed charge as $1,384.00, about 8 times what Medicare would pay for this work, and about 6.5 times what ACA insurance would pay for this work.

  Celtic's expert determined—upon review of the medical record associated with the claim—**that this claim should have been billed as CPT code 99284**. The difference between the amounts paid for a 99285 claim and a 99284 claim is material, and adds up to tens of millions of dollars across tens of thousands of claims.

- On August 15, 2017, a doctor under contract with TeamHealth saw a patient who **complained of "a typical headache for her." The discharge notes reflect that the patient was sent "home to rest."** TeamHealth submitted a health insurance claim to Celtic for this work on claim # 193092470/400. TeamHealth billed this work as CPT code 99285, the highest-severity ER code. TeamHealth listed the billed charge as $1,602.00, about 10 times what

---

[34] *See infra* Section III.B.

Medicare would pay for this work, and about 7.5 times what ACA insurance would pay for this work.

Celtic's expert determined—upon review of the medical record associated with the claim—**that this claim should have been billed as CPT code 99283**. The difference between the amounts paid for a 99285 claim and a 99283 claim is material, and adds up to tens of millions of dollars across tens of thousands of claims.

- On September 25, 2017, a doctor under contract with TeamHealth saw a patient who **complained of a "possible spider bite" "3 days ago."** The doctor instructed the patient to "f/u [follow up] with PCP [primary care physician] in 2 days and to return to ED if not improving or new or worrisome symptoms." TeamHealth submitted a health insurance claim to Celtic for this work on claim # 195542695/400. TeamHealth billed this work as CPT code 99285, the highest-severity ER code. TeamHealth listed the billed charge as $1,602.00, about 10 times what Medicare would pay for this work, and about 7.5 times what ACA insurance would pay for this work.

  Celtic's expert determined—upon review of the medical record associated with the claim—**that this claim should have been billed as CPT code 99283**. The difference between the amounts paid for a 99285 claim and a 99283 claim is material, and adds up to tens of millions of dollars across tens of thousands of claims.

- On March 18, 2018, a doctor under contract with TeamHealth saw a patient who **complained of a "fever for 3 days." The patient "does state that her sister was recently diagnosed with the flu days ago." The notes reflect "Presenting problems: low," and that the patient "was given a prescription for Tamiflu, and nausea medication. Instructed patient to follow up with primary care physician in 1-2 days."** TeamHealth submitted a health insurance claim to Celtic for this work on claim # 208596757/400. TeamHealth billed this work as CPT code 99285, the highest-severity ER code. TeamHealth listed the billed charge as $1,682.00, about 10 times what Medicare would pay for this work, and about 7.5 times what ACA insurance would pay for this work.

  Celtic's expert determined—upon review of the medical record associated with the claim—**that this claim should have been billed as CPT code 99283**. The difference between the amounts paid for a 99285 claim and a 99283 claim is material, and adds up to tens of millions of dollars across tens of thousands of claims.

65.     This evidence of upcoding is further supported by a review of more than 10,000 of TeamHealth's medical records by one of Celtic's affiliates this year. That review determined that nearly two-thirds of the TeamHealth's health insurance claims that were billed as CPT code 99285

24

or 99284 had been "upcoded" by TeamHealth and should have been billed as CPT code 99283. A spreadsheet with claim-level information regarding the claims identified in this review as upcoded is attached as EXHIBIT 2.

66.     Health insurance claims data from the past year illustrate the abnormal distribution of CPT codes billed by TeamHealth to Celtic for Celtic's Affordable Care Act members. According to an analysis of millions of health insurance claims, the *expected* CPT code distribution of ER claims (i.e., the proportion of claims billed at each of the five code levels) is materially different from the *actual* CPT codes billed by TeamHealth to Celtic for Affordable Care Act members. The difference is stark between TeamHealth's coding behavior and the expected coding behavior based on millions of claims:

| CPT Code: | Expected CPT code frequency based on millions of ER claims: | Frequency of CPT code billed by TeamHealth to Celtic for <u>Affordable Care Act</u> insurance members: |
|---|---|---|
| **99285 (Level 5)** | 27.26% | **48%** |
| **99284 (Level 4)** | 31.31% | **34%** |
| **99283** | 37.02% | **17%** |
| **99282** | 3.86% | **1%** |
| **99281** | .55% | **0%** |

67.     Health insurance claims data also show that TeamHealth bills Celtic for Celtic's Affordable Care Act members in a manner that is materially more aggressive than for Medicaid members. Because the needs of the population with Medicaid coverage are in general similar to the needs of the population with Affordable Care Act insurance, the disparity between TeamHealth's coding behavior for these two types of insurance shows that TeamHealth is upcoding Affordable Care Act claims:

25

| CPT Code: | Claims that TeamHealth billed as Level 5 on <u>Medicaid</u> members: | Claims that TeamHealth billed as Level 5 to Celtic on <u>Affordable Care Act</u> members: |
|---|---|---|
| **99285 (Level 5)** | Less than 30% | **48%** |

68.     TeamHealth's inflated coding seeks to profit from the fact that many Americans use emergency rooms to address all sorts of concerns that do not present emergent situations. Based on a 2017 survey, there were approximately 43 ER visits per 100 persons in the U.S. each year.[35] Of those visits, approximately 28 percent were "semiurgent" or "nonurgent."[36] That reality gives TeamHealth ample opportunity to upcode and get paid as if most of its patients have life-threatening emergencies when in fact they often need more routine medical services.

69.     Attached as EXHIBIT 3 is a detailed list of 191,556 health insurance claims that TeamHealth submitted to Celtic for a service provided to a Celtic Affordable Care Act member. In every one of these 191,556 health insurance claims, TeamHealth made a representation to Celtic that the service merited a CPT code of 99285 or 99284—the two highest ER CPT codes.  As described in this Complaint, TeamHealth's representations to Celtic were false and fraudulent on a material number of the 191,556 health insurance claims listed in EXHIBIT 3.  EXHIBIT 3 provides information about the affiliate under which TeamHealth billed the claim, the claim number, the age of the Celtic ACA member, the date of service, the date that Celtic received the health insurance claim, the date that Celtic paid the claim, and the CPT code that TeamHealth billed.  EXHIBIT 3 shows that of the 191,556 health insurance claims that TeamHealth billed to Celtic at the two highest CPT codes, TeamHealth billed 114,630 claims at a Level 5 (CPT code

---

[35]  Centers for Disease Control & Prevention, *National Hospital Ambulatory Medical Care Survey: 2017 Emergency Department Summary Tables* (Dec. 2017), https://www.cdc.gov/nchs/data/nhamcs/web_tables/2017_ed_web_tables-508.pdf.

[36]  *Id.*

99285) and 76,926 claims at a Level 4 (CPT code 99284). TeamHealth submitted additional claims to Celtic under affiliate names not identified in EXHIBIT 3. A partial list of suspected TeamHealth affiliates involved in the fraudulent scheme is attached as EXHIBIT 4 (identifying 133 suspected TeamHealth affiliates, many of which TeamHealth uses to bill insurance companies, including Celtic).

70.    TeamHealth has also billed Celtic for ER "critical care" CPT codes that are not warranted, and has billed these codes at an unjustifiably high rate. Critical care CPT codes are different from the 99281 through 99285 CPT codes discussed above. Critical care codes are reserved for rare situations where there is a high probability of sudden, clinically significant, or life-threatening deterioration in the patient's condition, which requires the highest level of physician preparedness to intervene urgently.

71.    TeamHealth's upcoding practices have been the subject of other lawsuits. The common thread among the cases is that TeamHealth, via its various subsidiaries and affiliates, improperly inflates the health insurance claims that it submits to insurance companies, the government, and patients via "upcoding." For example:

> In *United States ex rel. Hernandez v. Team Health, Inc.*, No. 2:16-CV-00432-JRG,
> 2020 WL 731446 (E.D. Tex. Feb. 13, 2020), the complaint alleged classic
> "upcoding" billing schemes. The judge in that case denied TeamHealth's motion
> to dismiss. The judge wrote, quoting the plaintiffs' complaint:
>
>> 8. The second Scheme is the "Critical Care Scheme." This Scheme is a
>> classic upcoding scheme. Under the Critical Care Scheme, TeamHealth
>> bills CMS for "critical care"—the highest level of emergency treatment
>> reserved for life-threatening situations—when in fact critical care services
>> were not rendered and/or were not medically necessary, thereby submitting
>> false claims through fraudulent billing. For example, in an April 2014 email
>> from TeamHealth West Associate Medical Director Elisa Dannemiller,
>> Relator Dr. Hernandez was told, "Just a reminder to keep up the critical care

27

billing! Abnormal vital signs, ICU admits, blood transfusions, trauma activations, and IV ggts all warrant critical care. We are still missing some obvious opportunities . . . ." However, these situations Dannemiller lists do not necessarily, and likely do not, require critical care in every instance because they do not necessarily meet the CMS definition for "critical care." Yet Dannemiller told healthcare providers that all of these situations warrant critical care every time. Dannemiller also explained in an October 2, 2013 PowerPoint presentation, "[y]ou can bill for critical care and send the patient home!" And in an October 26, 2014 email, Dannemiller imposed critical care billing quotas at 6-12%. . . .

10. TeamHealth employs this Scheme through its billing policies and practices to bill federal and state governments for millions of dollars for the services concerned. Through the Critical Care Scheme, TeamHealth has fraudulently obtained multiple millions of dollars each year since at least 2011 (when Relators began working for TeamHealth). Based on information and belief, TeamHealth began the Scheme much earlier than 2011 and continues to employ the Critical Care Scheme today.

11. TeamHealth is able to conceal these fraudulent claims because a critical care claim is a "pass through" claim for billing purposes, meaning there is no front-end auditing of these charges. For example, the April 2, 2014 TeamHealth Meeting Minutes reveal the following findings from a meeting regarding charting and billing: "Critical care billing has tapered to 3% compliance in February. There is significant variability in billing for those services and continued efforts are occurring to reach the desired 5–8%. Anything that can be done to enhance charting to collect more through billing is greatly appreciated and members noted that this type of charge is a pass through for billing, noting there is no auditing of these charges." *Hernandez*, 2020 WL 731446, at \*3–\*4.

72.    Similarly, in *Emergency Care Services of Pennsylvania et al. v. UnitedHealth Group et al.*, Case No. 5:20-cv-5094 (E.D. Pa.), UnitedHealth Group filed a counterclaim against members of the TeamHealth enterprise. ECF No. 37 of E.D. Pa. Case No. 5:20-cv-5094 (filed on Nov. 20, 2020). UnitedHealth explained that TeamHealth engaged in classic upcoding on health insurance claims that TeamHealth submitted to United. *See id.* at ¶¶ 27 & 28:

Upon review of the claim submissions that Plaintiffs/Counter-Defendants submitted to United for procedures and services that they billed using CPT codes 99283, 99284, and 99285, United discovered that the medical records and other documentation did not support the use of the reported codes in over 64% of these claims.

In particular, for CPT code 99285, United found that the CPT code was unsupported in approximately 82% of the claims submitted to United by Plaintiff/Counter-Defendant Emergency Care Services of PA, P.C., and in approximately 79% of the claims submitted to United by Plaintiff/Counter-Defendant Emergency Physician Associates of PA, P.C. In other words, for each of these claims, the use of CPT code 99285 was unsupported by the underlying medical records and documentation maintained by the Plaintiffs/Counter-Defendants. As such, the reporting of CPT code 99285 improperly resulted in higher remittance payments than those to which Plaintiff/Counter-Defendants were actually entitled.

73. As a result of TeamHealth's upcoding, Celtic has paid TeamHealth more than was warranted on tens of thousands of claims. Had TeamHealth assigned billing codes that accurately reflected the services provided, Celtic would have paid substantially less.

74. TeamHealth is able to conceal its upcoded health insurance claims because (a) the healthcare contractor who provided the service does not see the health insurance claims that TeamHealth submits to Celtic, (b) the patient who received the service does not see the health insurance claim that TeamHealth submits to Celtic, and (c) TeamHealth typically does not provide—and, indeed, has refused to provide when asked—medical records to Celtic. TeamHealth abuses this information asymmetry, and the large volume of claims it submits every day, to perpetrate fraud.

75. When patients find out that TeamHealth billed a "high severity" billing code for what the patient knows was a relatively minor service—like treatment for an ear infection—patients have complained publicly. For example, in August 2018, a mother found out that TeamHealth billed the Level 4 code (99284) for treating her child's ear infection. The mother submitted the following complaint to the Better Business Bureau:

TeamHealth send me a bill for services rendered by Dr G****** in April 2018. My kid visited the ER on a Saturday, **due to a ear infection with low fever**. After a quick examination, it was determined it was a ear infection and the doctor prescribed antibiotics. Right after the visit I received the bill from the hospital and we paid it. About a month later we receive a bill from TeamHealth for $1083 for "Emergency dept visit - G****** MD, **** *." **After some digging I found out**

29

**they had coded the visit as 99284 which the second to highest complexity procedure code for the ER**, that uses a range from 99281–99285. After hours on the phone they sent the bill back for code review, two months later they say the code is correct and they "decided" $1083 was the correct charge based on the procedure. By looking at the BBB complaint history, there seem to be some kind of systematic issue with the coding and rates this company is using. While on the phone, after my call was escalated to the code review department, I was "explained" each company has their own code descriptions and may use different codes for the same procedures, which doesn't sound right for a regulated industry. I did some research and I got the impression that the bill I received is between 2 and 3 times the usual amount for the same billing code (99284), and also that the appropriate code for a ear infection (otitis) would be 99282, which is significantly less expensive than 99284.[37]

76. Every time TeamHealth submitted a health insurance claim to Celtic, TeamHealth certified as follows: "the information on this form is true, accurate and complete," and "the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction." On a material number of health insurance claims that TeamHealth submitted to Celtic, these certifications were false.

77. Every time that TeamHealth submitted a health insurance claim to Celtic, TeamHealth also certified that it was in possession of an assignment of benefits form, signed by the patient-member who received the service, assigning the member's benefits from their Affordable Care Act health insurance to TeamHealth. On a material number of health insurance claims that TeamHealth submitted to Celtic, this certification was false because TeamHealth was not in fact in possession of a signed assignment of benefits form. In fact, the member had no idea that a TeamHealth-affiliated health care contractor had performed the services.

---

[37] Better Business Bureau Medical Billing Complaints (Aug. 2018), https://www.bbb.org/us/oh/akron/profile/medical-billing/akron-billing-center-0272-20000634/complaints (emphasis added). A TeamHealth employee responded to this complaint, writing on the Better Business Bureau website: "services rendered in the ER are considered high priority cases and charges are extremely higher than other providers." *Id.*

78.    None of the additional revenue that TeamHealth wrongfully gained through upcoding went to the front-line doctors and physician's assistants who treated the patients, because they are paid by TeamHealth by the hour, purportedly as "independent contractors."    The additional revenue generated through TeamHealth's fraud went directly to TeamHealth's bottom line.[38]   In fact, TeamHealth's chief financial officer has acknowledged that what TeamHealth charges does not affect how much TeamHealth pays its healthcare contractors who perform the relevant services.[39]

**B.    Billing for Services Provided by a Physician's Assistant as if a Doctor Provided the Service.**

79.    TeamHealth systematically bills for services provided by physician's assistants as if a doctor provided the service.   In the healthcare industry, services provided by a physician's assistant are paid at lower rates than services provided by a doctor.   For example, Celtic's billing manual states that Celtic pays for services provided by a physician's assistant "at 85% of what a physician is paid" under the appropriate fee schedule.   CMS has the same billing standards.   By misrepresenting to Celtic that a doctor provided the service—rather than a physician's assistant—TeamHealth has submitted thousands of overbilled and fraudulent insurance claims to Celtic.   On thousands of health insurance claims that TeamHealth submitted to Celtic, TeamHealth concealed the fact that a physician's assistant provided the service, and instead misrepresented to Celtic that a doctor did.   This is another form of "upcoding."

80.    Physician's assistants are qualified to provide certain ER services.   TeamHealth contracts with physician's assistants, and pays them on a physician's assistant pay scale.   But

---

[38]  Arnsdorf, *supra* note 17.

[39]  Arnsdorf, *supra* note 17.

31

TeamHealth systematically bills their work under a doctor's name and at a doctor's rate. TeamHealth keeps the extra money obtained through this fraud; the physician's assistants do not receive the benefit of TeamHealth's upcoding.

81. Data shows that TeamHealth submitted health insurance claims to Celtic under a doctor's name nearly 100% of the time in all states in which TeamHealth operates. By contrast, an analysis of more than 11 million claims submitted to Medicare across various states and various years shows that ER providers typically submit insurance claims under a doctor's name only about 82% of the time, and under a physician's assistant's name about 18% of the time.

82. TeamHealth's practice of billing services provided by a physician's assistant under a doctor's name has been the subject of other litigation. For example:

> In *United States ex rel. Hernandez v. Team Health, Inc.*, No. 2:16-CV-00432-JRG, 2020 WL 731446 (E.D. Tex. Feb. 13, 2020), the complaint alleged that TeamHealth bills services by physician's assistants under a doctor's name. The judge in that case denied TeamHealth's motion to dismiss. *Id.* at *11. The judge wrote, quoting the plaintiffs' complaint:
>
>> "Under the Mid-Level Scheme, TeamHealth overbills for services provided by "mid-level" practitioners. The term "mid-level" refers to non-physician healthcare providers, such as Physician Assistants ("PAs") and Nurse Practitioners ("NPs"). Under Centers for Medicare and Medicaid Services ("CMS") rules, a mid-level's services are reimbursed at 85% of the standard physician rate, while services rendered by a physician are reimbursed at 100% of the standard physician rate. These rates and percentages are set by CMS, and the Plaintiff States have largely, if not entirely, adopted these same rates and percentages for reimbursement." *Id.* at *2.

83. Patients sometimes complain publicly when they find out that TeamHealth billed for a doctor's service, when the patient knows that no doctor saw him or her. For example, in February 2020 a patient submitted the following complaint to the Better Business Bureau:

32

Akron Billing Department (teamhealth.com) sent me a bill for physician service from DR. Scott M\*\*\*\*\*\*\* at Brandywine hospital on 9/13. **I went to ER that day for minor burns, and all what happened was two nurses provided me with antibiotic cream. Dr. Scott M\*\*\*\*\*\*\* never seen me and never entered my room or provided me any kind of service.** The bill I received was for $1454 for basically a Physician service that I didn't get, the bill also has a charge for surgery/removal of burn tissue which never happened since they never removed any burn tissue, and/or dressing change which never happened as my wife was with me and she helped me dressing, all service I received only applying an anti-biotic cream for $15 and tetanus shot that I paid the hospital for.[40]

84.     By upcoding health insurance claims from a physician's assistant's name to a doctor's name, TeamHealth—without the doctor's or physician's assistant's knowledge—extracts a greater payment from an insurance company (or patient) than is warranted.  In reality, physician's assistants routinely provide quality care to patients in the ER—but TeamHealth submits health insurance claims as if that fact were not true.

**C.      Billing Charges that Are Eight, Nine, or Ten Times the Amount Allowed by Medicare.**

85.     Because TeamHealth acts as a gatekeeper between its healthcare contractors and insurance companies, TeamHealth decides whether its healthcare contractors in a particular hospital will be in-network with a particular insurance plan, or out-of-network.  To maximize profits, TeamHealth often pursues an "out-of-network strategy," opting not to contract with insurance companies and instead billing extremely high "billed charges," which TeamHealth unilaterally sets.

---

[40]  Better Business Bureau Medical Billing Complaints (Feb. 2020), https://www.bbb.org/us/oh/akron/profile/medical-billing/akron-billing-center-0272-20000634/complaints (emphasis added).  A TeamHealth employee responded to this complaint, writing on the Better Business Bureau website:  "As you are aware we bill for [physician] provider services which also include physicians assistants and nurse practitioners.  Carolyn B\*\*\*\* PA-C, a physicians assistant, has signed off on your medical records and is the physician assistant working with Dr. M\*\*\*\*\*\*\*.  You may request a copy of your medical records from the hospital for your review of PA-C's history, exam and diagnosis."  *Id.*

86.     By submitting thousands of claims to Celtic listing charges that are often eight, nine, or ten times the amount allowed by Medicare, TeamHealth tries to extract more than its fair share of dollars from the healthcare system, and it has even sued patients (thousands of times) and insurance companies to collect on these extremely high charges.  TeamHealth has frequently balance billed patients for the difference between what the insurer pays for out-of-network services and TeamHealth's extremely high billed charges.  When the patient is unable to pay that amount, TeamHealth often threatens to sue patients (or insurance companies) to collect their billed charges, and it has followed through on its threats thousands of times.

87.     TeamHealth's inflated "billed charges" have been the subject of other litigation. For example:

> In *Fraser v. Team Health Holdings, Inc.*, Case No. 20-4600 (N.D. Cal. filed July 10, 2020), the complaint alleged that TeamHealth routinely tries to collect inflated "billed charges" from patients:
>
>> "TeamHealth is a private equity-funded corporation that contracts with hospitals to take over their emergency, critical care, radiology, and anesthesiology departments, supplying them with doctors and other medical professionals as well as running their administrative functions.
>>
>> In 2016, TeamHealth boasted that it controlled 17% of the emergency medicine market in the United States. Currently, it operates 3,300 acute and post-acute facilities in 47 states. . . .
>>
>> **The TeamHealth Fraudulent Billing Enterprise maximizes its profits by sending fraudulent bills to patients for the care they receive from TeamHealth physicians. TeamHealth has inflated the rates it charges patient-consumers far above those that it knows it is legally entitled to collect from those patients**."
>
> Class Action Compl. ¶¶ 1–2, 6, *Fraser v. Team Health Holdings, Inc.*, Case No. 20-4600 (N.D. Cal. July 10, 2020).

34

88. Ultimately, TeamHealth's billing schemes harm patients. Inflated health insurance claims improperly increase cost-sharing obligations for patients, and ultimately drive up the cost of health care. For patients on Affordable Care Act insurance like that offered by Celtic, TeamHealth's billing schemes not only increase costs for patients but also put upward pressure on premiums that may cause the federal and state governments to spend more on cost-sharing subsidies and other taxpayer-funded support.

89. Neither patients, nor CMS, nor state healthcare regulators are in a position to discover or address TeamHealth's upcoding because they lack access to (a) the medical records, which show what services actually were rendered, or (b) the health insurance claims submitted to insurers, which show which billing code TeamHealth assigned to the services. Only TeamHealth has access to both of those, because TeamHealth does not typically provide—and often resists providing—medical records to insurance companies.

## CLAIMS FOR RELIEF

I.  **COUNT I:  RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO") — 18 U.S.C. § 1962(c)**

90. Celtic incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth herein.

91. RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).

92. RICO also provides: "Any person injured in his business or property by reason of a violation of [18 U.S.C. § 1962] may sue therefor in any appropriate United States district court

and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee[.]"

93.    Celtic is a "person" within the meaning of 18 U.S.C. §§ 1961(3) & 1964(c).

94.    Defendants are each a "person" within the meaning of 18 U.S.C. § 1961(3).

**A.    The TeamHealth Upcoding Enterprise**

95.    A RICO "enterprise" "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

96.    For purposes of this Complaint, the relevant enterprise, herein referred to as the "TeamHealth Upcoding Enterprise," or "the Enterprise," is an association in fact, consisting of: (a) TeamHealth; (b) TeamHealth's direct regional subsidiaries; (c) the individual corporations and other legal entities that employ and/or contract with the healthcare contractors whose services TeamHealth sells, and which TeamHealth either indirectly owns through its regional subsidiaries or controls *de facto*.

97.    Both Defendants have an existence separate and distinct from the Enterprise, in addition to directly participating in and acting as a part of the Enterprise.

98.    Although the various components of the Enterprise play different roles, they all serve a common purpose: allowing TeamHealth to submit fraudulently upcoded health insurance claims to insurers, and to keep the difference between the amount received as a result of the upcoded claim, and the amount that would have been received had the claim been properly coded.

99.    The front-line healthcare workers employed as independent contractors by the Enterprise's corporate subsidiaries and/or *de facto* controlled affiliates provide medical services to patients in emergency rooms.

36

100.     TeamHealth's numerous subsidiaries and affiliates—over 100 separate entities, including those identified in EXHIBIT 4—have a mixture of corporate ownership structures. Some of TeamHealth's affiliates are wholly owned by TeamHealth; others are partially owned by TeamHealth; and some are wholly owned by others.  For example, ACS Emergency Services is a TeamHealth affiliate, and is listed as item 3 on EXHIBIT 4.  ACS Emergency Services is wholly owned by one of the co-founders of TeamHealth.

101.     Without these corporations and the healthcare contractors who provide services, the Enterprise would have nothing to upcode.

102.     The Enterprise's regional subsidiaries oversee the entities employing or contracting with healthcare contractors, and they negotiate contracts with hospitals as conduits of the Enterprise.  Without the regional subsidiaries and the hospitals through which Enterprise's subsidiaries deploy its healthcare contractors, the Enterprise's healthcare contractors would have no patients to service, and TeamHealth's ability to efficiently coordinate and direct the activities of the corporations employing the healthcare contractors would be diminished.

103.     TeamHealth coordinates the entire Enterprise; performs the upcoding; employs the staff that receives medical records from TeamHealth's healthcare contractors; and applies CPT codes to those records in accordance with policies dictated by TeamHealth.

104.     The organization of the Enterprise, and specifically its use of subsidiaries and purported independent contractors rather than direct employment of healthcare contractors, facilitates the Enterprise's fraudulent upcoding scheme in two ways.

105.     *First*, if TeamHealth directly employed all of the healthcare contractors controlled by it, or if it directly owned all the corporate practice groups that provide services on its behalf, TeamHealth would violate various state laws prohibiting the corporate practice of medicine.  The

Enterprise's complex legal structure is therefore essential to its functioning and to its ability to control and profit from healthcare providers who appear to patients and the public to be independent.

106.    *Second*, by operating through subsidiaries and other entities that have names such as "Southeastern Emergency Physicians," TeamHealth tries to create the impression that patients have received services from a local doctors' group. TeamHealth almost never bills patients or insurance companies under its own name. This creates the illusion that its healthcare contractors are providing care that is locally owned and directed. This illusion disguises the truth and makes TeamHealth's fraud more difficult to detect, because it submits upcoded and inflated health insurance claims under the names of dozens of different corporate entities, with no indication that they are affiliated with TeamHealth. This illusion also helps protect TeamHealth politically and to insulate its activities, including by avoiding public scrutiny for the thousands of lawsuits it has filed under various corporate names against individuals and insurance companies.

107.    As the topmost corporate entity of what it calls the "TeamHealth system," TeamHealth conducts and directs the TeamHealth Upcoding Enterprise and sets policies that govern the functioning of all components of the Enterprise. TeamHealth is responsible for the actual upcoding, which occurs after its healthcare contractors submit medical records that document the actual services provided to the patient. TeamHealth uses those medical records and improperly exaggerates the services they reflect, consistent with TeamHealth's procedures, in order to submit a massive number of "upcoded" health insurance claims to insurance companies.

## B.    TeamHealth's Pattern of Racketeering Activity

108.    RICO prohibits the conduct of an enterprise "through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Racketeering acts are defined at 18 U.S.C. § 1961(1), and include mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343.

38

109. TeamHealth, through the TeamHealth Upcoding Enterprise, has committed tens of thousands of acts of mail fraud and wire fraud. Specifically, Team Health has conducted a scheme to defraud Celtic and insurers like Celtic, with specific intent to obtain money from those insurers by materially false and fraudulent representations, and to use the mails and interstate wires in furtherance of the scheme.

110. Central to TeamHealth's scheme to defraud is the systematic upcoding of medical services provided to insured patients by healthcare contractors that are under TeamHealth's control. TeamHealth's upcoding scheme misrepresents the nature of the services provided to Celtic's insureds, for the purpose of recovering more money from Celtic and from patients (via cost-sharing and/or surprise billing). Because insurers, including Celtic, do not have access to the underlying medical records that form the basis of TeamHealth's health insurance claims, and because of the massive volume of health insurance claims, insurers rely on TeamHealth's representations regarding the nature of the services provided.

111. TeamHealth's scheme has been carried out with the specific intent to defraud Celtic and other insurers. The statistical evidence detailed above, as well as evidence that will be developed in discovery and presented at trial, indicates that TeamHealth has submitted a proportion of health insurance claims to Celtic under the highest CPT code for services by its healthcare contractors—and a proportion of its claims for services by doctors as opposed to physician's assistants—that is so large that many of the claims are false. Instances of upcoding in TeamHealth's health insurance claims are not mere isolated incidents, but instead are part of a pattern and practice of upcoding intended to increase TeamHealth's revenue and profits. The fact that TeamHealth's coding is conducted at a centralized location, under the oversight of

39

TeamHealth management, further demonstrates that TeamHealth's tens of thousands of upcoded health insurance claims are not a matter of mere coincidence.

112. TeamHealth has used the mails and interstate wires in furtherance of its upcoding scheme to defraud Celtic in a number of ways, including:

a. Mail and wire receipt of medical records from TeamHealth-affiliated hospitals located throughout the country at TeamHealth's coding operations facility in Tennessee;

b. Mail and wire transmission of fraudulently upcoded health insurance claims from Tennessee to insurers, including Celtic, in numerous states throughout the country;

c. Mail and wire transmission of marketing materials to hospitals in order to sell TeamHealth's staffing services and expand the scope of the Enterprise;

d. Mail and wire receipt of money from insurers in various states, including Celtic, representing the unlawful proceeds of TeamHealth's fraudulent upcoding scheme;

e. Mail and wire communications between TeamHealth and its regional subsidiaries and provider groups in various states.

113. TeamHealth's repeated acts of racketeering activity form a "pattern" under RICO because they occurred within ten years of each other, were continuous, and are related.

114. Through its many mailings and wire communications in furtherance of its scheme to defraud, TeamHealth has committed tens of thousands of acts of racketeering activity. These acts are part of a common scheme and have the same purpose: to extract greater payments from insurance companies than TeamHealth is entitled to. TeamHealth has adopted policies

40

encouraging upcoding, and has a regular staff dedicated to coding that is trained to adhere to TeamHealth's practice of upcoding on a systematic basis. Upcoding is part of TeamHealth's regular way of doing business, and there is every reason to believe that, absent judicial intervention, TeamHealth will continue its upcoding scheme for as long as the scheme remains profitable.

## C. Injury to Celtic

115. TeamHealth's upcoding scheme has directly caused injury to Celtic's business and property. Celtic suffers injury each time it pays a health insurance claim in reliance on TeamHealth's coding, where the CPT code on that claim does not accurately represent the service actually provided, or where the claim represents that the service was provided by a medical doctor when the service was actually provided by a physician's assistant. Celtic's damages consist of the difference between the amount that Celtic paid TeamHealth on each upcoded health insurance claim, and the amount that Celtic would have paid if the underlying medical services had been properly coded.

116. By virtue of these violations of 18 U.S.C. § 1962(c), and pursuant to 18 U.S.C. § 1964(c), TeamHealth is liable to Celtic for three times the damage that Celtic has sustained, plus the cost of bringing this suit, including reasonable attorneys' fees.

117. Celtic also seeks injunctive relief requiring TeamHealth to alter its current policies incentivizing upcoding, retrain its coding staff to properly code medical records rather than systematically upcode medical records, and submit to a regular, at least yearly, audit of its coding practices by an independent monitor, with all costs of such audit to be paid by TeamHealth. Absent such an injunction, TeamHealth's upcoding is likely to continue, as it is a profitable, though unlawful, business strategy.

## II. <u>COUNT II</u>: CONSPIRACY TO VIOLATE RICO — 18 U.S.C. § 1962(d)

118.     Celtic incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth herein.

119.     The two Defendants, collectively referred to as TeamHealth, agreed with each other to pursue the schemes described above, namely, "classic" upcoding and falsely billing services provided by physician's assistants as though they were performed by a doctor, with the ultimate objective of realizing increased revenue and profits.   Although Celtic only learned of this conspiracy within the last year, it began at least seven years ago, when Celtic started offering Affordable Care Act health insurance, and continues today.

120.     Both Defendants took overt acts in furtherance of the conspiracy, namely, promulgating policies that required TeamHealth employee responsible for coding insurance claims to upcode those claims.

121.     Both Defendants knew that their policies would lead to a pattern and practice of submitting false and inflated claims to Celtic and other insurers, for the purpose of obtaining money from those insurers by materially false and fraudulent representations, and to the use of the mails and interstate wires in furtherance of the scheme.

122.     TeamHealth's upcoding scheme has directly caused injury to Celtic.  Celtic suffers injury each time it pays a health insurance claim in reliance on TeamHealth's coding, where the CPT code on that claim does not accurately represent the service actually provided, or where the claim represents that the service was provided by a medical doctor when the service was actually provided by a physician's assistant.  Celtic's damages consist of the difference between the amount that Celtic actually paid TeamHealth on each upcoded health insurance claim, and the amount that Celtic would have paid if the underlying medical services had been properly coded.

42

123.     By virtue of these violations of 18 U.S.C. § 1962(c), and pursuant to 18 U.S.C. § 1964(c), TeamHealth is liable to Celtic for three times the damage that Celtic has sustained, plus the cost of bringing this suit, including reasonable attorneys' fees.

124.     Celtic also seeks injunctive relief requiring TeamHealth to alter its current policies incentivizing upcoding, retrain its coding staff to properly code medical records rather than systematically upcode medical records, and submit to a regular, at least yearly, audit of its coding practices by an independent monitor, with all costs of such audit to be paid by TeamHealth. Absent such an injunction, TeamHealth's upcoding is likely to continue, as it is a profitable, though unlawful, business strategy.

## III.     COUNT III:  FRAUD — Tennessee Common Law

125.     Celtic incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth herein.

126.     Each time TeamHealth submitted a health insurance claim for ER services to Celtic, TeamHealth made a representation of material fact: namely, that the CPT code appearing on the health insurance claim accurately represented the service provided to Celtic's insureds and who provided the service. Those representations were material to Celtic because they determined the amount that Celtic would pay to TeamHealth for each service.

127.     TeamHealth applied upcoding to a large proportion of the health insurance claims that it submitted to Celtic. When TeamHealth applied upcoding, the CPT code appearing on its health insurance claim did not, in fact, accurately represent the services provided to Celtic's insureds, or the doctor listed on the claim had not provided the service, which was instead provided by a physician's assistant. For example, each time that TeamHealth submitted to Celtic a health insurance claim with the CPT code 99285, it represented that the problem was high severity and

43

posed an immediate significant threat to life or physiologic function. As set forth above, in tens of thousands of cases, those representations were false.

128. TeamHealth has made these false and fraudulent representations to Celtic on a regular and recurring basis since at least 2014, although Celtic did not discover the fraudulent nature of the representations to Celtic's Affordable Care Act insurance until 2020, when TeamHealth was ordered by a court on a motion to compel to produce certain medical records in litigation with Celtic. Because TeamHealth has exclusive control over the necessary facts, and because of the large volume of representations and Celtic's lack of access to all of the relevant medical records, it is not possible at this point to identify every specific instance of fraud by TeamHealth. Nonetheless, the health insurance claims described in EXHIBITS 1, 2 and 3 are more than adequate to put TeamHealth on notice of the nature of the allegations regarding its fraudulent claims.

129. EXHIBIT 3 is a detailed list of roughly 200,000 health insurance claims that TeamHealth submitted to Celtic for Celtic's Affordable Care Act members in which TeamHealth made a representation to Celtic that the work performed merited a CPT code of 99285 or 99284— the two highest ER CPT codes.

130. TeamHealth knew that its representations were false, or at a minimum was reckless with regard to their truth, because TeamHealth has access to the underlying medical records for each patient, and is thus aware, in each instance of upcoding, that the medical services actually rendered do not match the representations on TeamHealth's health insurance claims, and/or that the services were not provided by a doctor as indicated on the claim form.

131. Celtic reasonably relied on TeamHealth's representations in making payment to TeamHealth for services rendered to Celtic's insureds. Because Celtic does not have access to

44

patients' underlying medical records, and because of the volume of TeamHealth's health insurance claims, Celtic has reasonably relied on TeamHealth's representations in its health insurance claims in determining the amount of payment made to TeamHealth. Celtic discovered the substantial falsity of TeamHealth's representations to Celtic for Affordable Care Act claims through discovery in separate litigation.

132.   Celtic was injured by TeamHealth's false representations in an amount to be determined at trial, specifically, through the difference between the amount that Celtic paid to TeamHealth based on the CPT codes and providers named in the health insurance claims that TeamHealth billed, and the amount that Celtic would have paid had TeamHealth submitted properly coded health insurance claims.

133.   TeamHealth's misconduct was intentional, egregious, malicious, and reckless: TeamHealth consciously implemented a policy of systematic upcoding via its centralized coding staff in order to secure increased revenue and profits. As discussed above, TeamHealth's conduct was fraudulent. Therefore, TeamHealth is liable for punitive damages in an amount to be determined at trial.

**IV.   <u>COUNT IV</u>:  NEGLIGENT MISREPRESENTATION — Tennessee Common Law**

134.   Celtic incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth herein.

135.   Celtic pleads this claim in the alternative to Count III.

136.   Each time that TeamHealth submitted a health insurance claim to Celtic, TeamHealth made a representation of material fact: namely, that the CPT code appearing in the health insurance claim accurately represented the services provided by a TeamHealth healthcare contractor to Celtic's insureds. That representation was material to Celtic because it determined the amount that Celtic would pay to TeamHealth for the service.

45

137.     TeamHealth utilized upcoding to increase payments on a large proportion of the health insurance claims that it submitted to Celtic from 2014 to present.  On TeamHealth's upcoded health insurance claims, the CPT code appearing on the claim did not in fact, accurately represent the service provided to Celtic's insureds, and/or TeamHealth billed for services provided by a physician's assistant as if the service was provided by a doctor.  For example, each time TeamHealth submitted to Celtic health insurance claims with the CPT code 99285, it represented that the problem was high severity and posed an immediate significant threat to life or physiologic function.  As detailed above, in thousands of cases, those representations were false.

138.     TeamHealth made these false and fraudulent representations to Celtic on a regular and recurring basis since at least 2014, although Celtic did not discover the fraudulent nature of the representations until 2020.

139.     Because of the large volume of representations in question, and because it is not possible without discovery to identify which specific TeamHealth health insurance claims contained misrepresentations without access to the medical records in question, it is not possible at this point to precisely identify each instance of misrepresentation by TeamHealth, as the necessary facts are within TeamHealth's exclusive control.

140.     TeamHealth made representations to Celtic in the regular course of TeamHealth's business.  Coding and submission of health insurance claims for emergency room services to Celtic and other insurance companies and patients is the primary source of revenue for TeamHealth and is at the core of TeamHealth's regular business.

141.     TeamHealth intended that Celtic would rely on TeamHealth's representations in the course of Celtic's own business.  TeamHealth knew that Celtic would rely on the CPT codes

and other information that TeamHealth submitted in its health insurance claims, and would use that information to determine the amount of payment to make to TeamHealth.

142.    TeamHealth had a duty to exercise reasonable care in obtaining information about its business and in communicating that information to others, like Celtic, who TeamHealth knew would rely on that information.

143.    TeamHealth breached its duty of reasonable care by creating tens of thousands of health insurance claims that contained higher CPT codes than the underlying medical services warranted, and by transmitting those health insurance claims to Celtic without ensuring that the CPT code accurately described the level of service provided or that the claim correctly identified the healthcare contractor who provided the service.

144.    Celtic reasonably relied on TeamHealth's representations in making payment to TeamHealth for services rendered to Celtic's insureds.  Because Celtic does not typically have access to patients' underlying medical records, it relies on TeamHealth's representations regarding the level of service performed to determine the amount of payment to TeamHealth.  Celtic only discovered the falsity of TeamHealth's representations to Celtic on Affordable Care Act claims through discovery in separate litigation.

145.    Celtic was injured by its reasonable reliance on TeamHealth's false representations in an amount to be determined at trial, specifically, through the difference between the amount that Celtic paid based on the CPT codes that TeamHealth presented in tens of thousands of health insurance claims, and the amount that Celtic would have paid if TeamHealth had instead submitted health insurance claims that accurately identify the level of service and the type of provider.

146.    Because TeamHealth was reckless and its conduct was egregious, Celtic is entitled to punitive damages.

47

## V.  __COUNT V__:  TENNESSEE CONSUMER PROTECTION ACT

147.    Celtic incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth herein.

148.    The Tennessee Consumer Protection Act (TCPA), Tenn. Code Ann. §§ 47-18-101 et seq., is designed "[t]o protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within this state."  Tenn. Code Ann. § 47-18-102(2).

149.    Under that statute, "[a]ny person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice declared to be unlawful by this part, may bring an action individually to recover actual damages."  Tenn. Code Ann. § 47-18-109(a)(1).

150.    The TCPA defines "[t]rade, commerce, or consumer transaction" to mean "the advertising, offering for sale, lease or rental, or distribution of any goods, services, or property, tangible or intangible, real, personal, or mixed, and other articles, commodities, or things of value wherever situated."  Tenn. Code Ann. § 47-18-109(a)(11).  The statute defines "[s]ervices" to include "any work, labor, or services including services furnished in connection with the sale or repair of goods or real property or improvements thereto."  *Id.* § 47-18-109(a)(10).  By contracting with hospitals to provide ER staffing and related services, and submitting insurance claims to insurers for payment, TeamHealth engaged in "[t]rade, commerce, or consumer transaction[s]" within the meaning of the TCPA.  TeamHealth's activities, including its coding practices, took place at its corporate offices in Tennessee.

151.    TeamHealth engaged in unfair or deceptive acts or practices in the conduct of trade or commerce, including but not limited to the following:

48

a.  TeamHealth systematically engages in upcoding, or billing for a higher level of service than was actually provided by its healthcare contractors;

b.  TeamHealth systematically bills for services performed by physician's assistants as if the relevant service were performed by a doctor; and

c.  TeamHealth uses an "out-of-network strategy" to try to collect "billed charges" that are grossly inflated and are often eight, nine, or ten times the amount allowed by Medicare, and bear no resemblance to the cost of providing the service.

152.  TeamHealth's conduct falls within the unfair or deceptive acts or practices defined in the TCPA, including but not limited to the following:

a.  "Representing that goods or services have . . . characteristics . . . benefits or quantities that they do not have" (Tenn. Code Ann. § 47-18-104(b)(5));

b.  "Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another" (Tenn. Code Ann. § 47-18-104(b)(7));

c.  "Representing that a service, replacement or repair is needed when it is not" (Tenn. Code Ann. § 47-18-104(b)(13).

153.  As a result of TeamHealth's use or employment of unfair or deceptive acts or practices, Celtic has suffered an ascertainable loss of money or property.  For instance, TeamHealth's systematic upcoding, misrepresentation of services as performed by doctors instead of physician's assistants, and billing of high out-of-network charges caused Celtic to pay substantially more on TeamHealth's insurance claims than it would have paid had TeamHealth not

49

engaged in these practices. TeamHealth's conduct ultimately harmed insureds by exerting upward pressure on insurance premiums, cost-sharing obligations, and healthcare costs in general.

154. As a result of TeamHealth's conduct, Celtic is entitled to recover actual damages in an amount to be determined at trial.

155. TeamHealth's use or employment of the unfair or deceptive acts and practices constituted willful and knowing violations of the TCPA. In particular, TeamHealth knew the services that its healthcare contractors actually performed based on the medical charts completed by the providers. By assigning higher-level billing codes than those services merited and submitting those codes to Celtic for payment, TeamHealth knowingly and willfully caused Celtic to pay more for the ER services than was warranted. TeamHealth intentionally misrepresented the services provided to secure greater payments, knowing that it would be difficult for Celtic to discover the upcoding without the underlying medical records. TeamHealth's systematic scheme to extract higher payments from Celtic, other insurance companies, and CMS reflects bad faith. Based on these knowing and willful violations of the TCPA, Celtic is entitled to have its actual damages trebled pursuant to Tenn. Code Ann. § 47-18-109(a)(3) and § 47-18-109(a)(4).

156. Celtic is entitled to reasonable attorney's fees and costs pursuant to Tenn. Code Ann. § 47-18-109(e)(1).

## VI. <u>COUNT VI: FRAUDULENT INSURANCE ACT — Tennessee Insurance Law</u>

157. Celtic incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth herein.

158. The Tennessee Insurance Law, Tenn. Code. Ann. §§ 56-53-101 et seq., makes it "unlawful for any person [including a company] to commit . . . a fraudulent insurance act." Tenn. Code Ann. § 56-53-102(b).

159.    "Any person injured in the person's business or property" by a fraudulent insurance act can sue "in any appropriate court having jurisdiction" to recover damages.  Tenn. Code Ann. § 56-53-107(b)(1).

160.    An entity commits a "fraudulent insurance act" when it "knowingly and with intent to defraud, and for the purpose of depriving another of property or for pecuniary gain," commits any of the enumerated acts. Tenn. Code Ann. § 56-53-102(a).   The statutory list includes "[p]resent[ing] . . . on behalf of an insured . . . to an insurer . . . in connection with an insurance transaction . . . any information that contains false representations as to any material fact . . . concerning . . . [a] claim for payment or benefit pursuant to any insurance policy."  Tenn. Code Ann. § 56-53-102(a).

161.    When TeamHealth submitted health insurance claims for ER services to Celtic, TeamHealth presented, on behalf of Celtic's Affordable Care Act members, claims for payment pursuant to those patients' Affordable Care Act insurance policies.   TeamHealth made representations that the CPT code stated on those claims accurately reflected the service provided; that the healthcare contractor who performed the service is accurately identified on the claim, and that TeamHealth was in possession of a signed assignment of benefits form from the member. Those representations were material to Celtic because they determined the amount Celtic would pay to TeamHealth for the services rendered to Celtic's insureds.

162.    TeamHealth upcoded a broad swath of the health insurance claims that it submitted to Celtic.  The upcoded claims did not truthfully describe the service provided or the healthcare contractor who performed it.  For example, each time that TeamHealth transmitted to Celtic a health insurance claim with the CPT code 99285, TeamHealth represented that the member's

medical need was of high severity and posed an immediate significant threat to life or physiologic function. As detailed above, in thousands of cases, those representations were knowingly false.

163.    TeamHealth made these material false representations to Celtic repeatedly since at least 2014. Celtic, however, did not and could not detect this scheme until this year, when a judge granted Celtic's motion to compel TeamHealth to produce medical records underlying health insurance claims at issue in that case. Celtic presently cannot identify every specific instance of fraud by TeamHealth, because Celtic does not have in its possession the vast majority of medical records underlying the hundreds of thousands of health insurance claims that TeamHealth has submitted to Celtic in the past seven or more years. These medical records remain in TeamHealth's exclusive control, although Celtic will seek them in discovery in this case.

164.    TeamHealth knew that its representations were false because it had access to the medical records for each patient and thus was aware that its upcoded health insurance claims mischaracterize the services actually provided. TeamHealth also knew that its representations were false because TeamHealth's false representations were but one facet of TeamHealth's policies and procedures designed to maximize revenue through systematic upcoding and overbilling, as described in detail above.

165.    TeamHealth has sent tens of thousands of upcoded health insurance claims to Celtic from TeamHealth's corporate offices over the past seven or so years. TeamHealth's longstanding practice of upcoding and misrepresenting services on health insurance claims demonstrates that TeamHealth intended to defraud Celtic through systematic upcoding and overbilling. TeamHealth engaged in this fraud for pecuniary gain because it stood to reap millions in higher payments that correspond to higher billing codes.

166.     Celtic suffered economic injury because TeamHealth's deceit induced Celtic to make payments that exceeded the amount that it would have paid had the claims been properly coded. Therefore, Celtic is entitled to a "[r]eturn of any profit, benefit, compensation or payment" that TeamHealth obtained from its fraudulent insurance acts and "[a]ll other economic damages directly resulting from" these acts. *See* Tenn. Code Ann. § 56-53-107(b)(1)(A), (C).

167.     Because TeamHealth consistently utilized upcoding to inflate insurance claims, it had a pattern and practice of fraudulent insurance acts. Accordingly, Celtic is entitled to threefold the economic damages attributable to TeamHealth's fraud. *See* Tenn. Code Ann. § 56-53-107(c).

168.     Celtic is also entitled to reasonable attorneys' fees and related legal expenses, reasonable fees incurred in investigating TeamHealth's violations, and a penalty within the prescribed range of $100–$10,000 per violation that the Court deems just. *See* Tenn. Code Ann. § 56-53-107(b)(1)(B), (D), (E).

## VII.     <u>COUNT VII</u>: FRAUDULENT INSURANCE ACT, ATTEMPT — Tennessee Insurance Law

169.     Celtic incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth herein.

170.     The Tennessee Insurance Law makes it "unlawful for any person to . . . attempt to commit . . . a fraudulent insurance act." Tenn. Code Ann. § 56-53-102(b).

171.     "Any person injured in the person's business or property" by an attempted fraudulent insurance act may sue for damages. Tenn. Code Ann. § 56-53-107(b)(1).

172.     A person commits a "fraudulent insurance act" when it "knowingly and with intent to defraud, and for the purpose of depriving another of property or for pecuniary gain," "[p]resents . . . on behalf of an insured . . . to an insurer . . . in connection with an insurance transaction . . .

any information that contains false representations as to any material fact . . . concerning . . . [a] claim for payment or benefit pursuant to any insurance policy." Tenn. Code Ann. § 56-53-102(a).

173.    TeamHealth submitted thousands of false and fraudulent insurance claims to Celtic. TeamHealth billed and attempted to collect its entire "billed charges," knowing that the billed charges reflected TeamHealth's upcoding, which misrepresented the true complexity or severity of the patient encounter, and who provided the service.  This fraudulent conduct, spanning at least the past seven or more years, constituted substantial steps toward the consummation of a fraudulent scheme designed to extract unearned payments from Celtic.  TeamHealth's course of action at all times coincided with its specific intent to commit such fraudulent insurance acts.  By submitting upcoded claims knowing that they misrepresented the services actually provided and who provided the service, TeamHealth specifically intended to deceive Celtic into paying greater reimbursements than were warranted.

174.    TeamHealth's attempted fraudulent insurance acts have directly and proximately injured Celtic in its business or property.  TeamHealth's deceit induced Celtic to pay substantially more money to TeamHealth than Celtic would have paid had TeamHealth not submitted fraudulent insurance claims.  Therefore, Celtic is entitled to a "[r]eturn of any profit, benefit, compensation or payment" that TeamHealth obtained from its attempted fraudulent insurance acts and "[a]ll other economic damages directly resulting from" these attempts.  *See* Tenn. Code Ann. § 56-53-107(b)(1)(A), (C).

175.    Because TeamHealth consistently deployed the two variants of upcoding to inflate claims, it had a longstanding pattern and practice of attempted fraudulent insurance acts. Therefore, Celtic is entitled to threefold the economic damages that TeamHealth attempted to cause through its fraudulent acts.  *See* Tenn. Code Ann. § 56-53-107(c).

54

176.    Celtic is also entitled to reasonable attorneys' fees and related legal expenses, reasonable fees incurred in investigating TeamHealth's violations, and a penalty within the statutory range of $100–$10,000 for each attempted fraudulent insurance act.  *See* Tenn. Code Ann. § 56-53-107(b)(1)(B), (D), (E).

## VIII.    <u>COUNT VIII</u>: UNLAWFUL INSURANCE ACT — Tennessee Insurance Law

177.    Celtic incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth herein.

178.    Celtic pleads this claim in the alternative to Counts VI and VII.

179.    The Tennessee Insurance Law makes it "unlawful for any person to commit . . . an unlawful insurance act."  Tenn. Code Ann. § 56-53-103(b).

180.    "Any person injured in the person's business or property" by an unlawful insurance act may sue for damages. Tenn. Code Ann. § 56-53-107(a)(1).

181.    Unlawful insurance acts include knowingly or recklessly, and with an "intent to induce reliance," "[p]resent[ing] . . . on behalf of an insured . . . to an insurer" false representations of material fact about "[a] claim for payment or benefit pursuant to any insurance policy."  Tenn. Code Ann. § 56-53-103(a)(1).

182.    When TeamHealth submitted health insurance claims for ER services to Celtic, TeamHealth presented, on behalf of Celtic's Affordable Care Act members, claims for payment pursuant to those patients' Affordable Care Act insurance policies.  TeamHealth made representations that the CPT code stated on those claims accurately reflected the service provided; that the healthcare contractor who performed the service is accurately identified on the claim, and that TeamHealth was in possession of a signed assignment of benefits form from the member.

55

Those representations were material to Celtic because they determined the amount Celtic would pay to TeamHealth for the services rendered to Celtic's insureds.

183.    TeamHealth upcoded a broad swath of the health insurance claims that it submitted to Celtic. The upcoded claims did not truthfully describe the service provided or the healthcare contractor who performed it. For example, each time that TeamHealth transmitted to Celtic a health insurance claim with the CPT code 99285, TeamHealth represented that the member's medical need was of high severity and posed an immediate significant threat to life or physiologic function. As detailed above, in thousands of cases, those representations were false.

184.    TeamHealth has routinely made these material false representations to Celtic for at least the past seven years. Celtic did not and could not discover them until separate litigation this year exposed some of the medical records that TeamHealth had sought to conceal. Celtic presently cannot identify every specific instance of unlawful insurance acts by TeamHealth, because TeamHealth maintains exclusive control over the vast majority of the medical records underlying the claims that it has submitted to Celtic for Affordable Care Act members.

185.    TeamHealth knew that its representations were false, or at least acted with reckless disregard for their falsity, because the medical records it received from its healthcare contractors did not support the billing codes that TeamHealth assigned. TeamHealth intended to induce Celtic to rely on its false representations because it sent the upcoded health insurance claims, without the medical records, knowing that Celtic would pay the claim without the ability to reconcile the claim with the medical record.

186.    Celtic endured economic injury from millions of excess payments to TeamHealth. Celtic would have paid less if TeamHealth had not upcoded the claims at issue. Thus, Celtic is

entitled to a return of TeamHealth's ill-gotten profit, benefit, or payment and to reasonable attorneys' fees and related legal expenses. *See* Tenn. Code Ann. § 56-53-107(a)(1).

## IX.   COUNT IX: UNLAWFUL INSURANCE ACT, ATTEMPT — Tennessee Insurance Law

187.   Celtic incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth herein.

188.   Celtic pleads this claim in the alternative to Counts VI and VII.

189.   The Tennessee Insurance Law makes it "unlawful for any person . . . to attempt to commit . . . an unlawful insurance act." Tenn. Code Ann. § 56-53-103(b).

190.   "Any person injured in the person's business or property" by an attempted unlawful insurance act may sue for damages. Tenn. Code. Ann. § 56-53-107(a)(1).

191.   Unlawful insurance acts include knowingly or recklessly, and with an "intent to induce reliance," "[p]resent[ing] . . . on behalf of an insured . . . to an insurer" false representations of material fact about "[a] claim for payment or benefit pursuant to any insurance policy." Tenn. Code Ann. § 56-53-103(a)(1).

192.   TeamHealth submitted thousands of materially false insurance claims to Celtic. TeamHealth billed and attempted to collect its entire "billed charges," knowing that the billed charges misrepresented the complexity or severity of the patient encounter or without a reasonable belief in the truth of the assigned code or provider identifier on the claims. This course of action, spanning at least the past seven or more years, TeamHealth's conduct constituted substantial steps toward the commission of an unlawful scheme that would have caused Celtic to pay millions more in unwarranted payments to TeamHealth. TeamHealth pursued this course of action with the specific intent to commit such unlawful insurance acts. By submitting upcoded claims knowing

57

or recklessly disregarding that they misrepresented the services actually provided and/or who performed the services, TeamHealth specifically intended to induce Celtic to rely on those claims and make greater payments to TeamHealth than was warranted.

193.    TeamHealth's attempted unlawful insurance acts have directly and proximately injured Celtic in its business or property.  By recklessly submitting insurance claims bearing inflated CPT codes and misrepresenting information about who provided the service, TeamHealth caused Celtic to pay substantially more to TeamHealth than it would have had it known the truth about the services provided.  Therefore, Celtic is entitled to a return of any profit, benefit, or payment that TeamHealth extracted from these attempts and to reasonable attorneys' fees and related legal expenses.  *See* Tenn. Code Ann. § 56-53-107(a)(1).

## X.    <u>COUNT X</u>:  UNJUST ENRICHMENT — Tennessee Common Law

194.    Celtic incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth herein.

195.    Celtic has repeatedly conferred benefits on TeamHealth, namely, payment for services purportedly rendered by TeamHealth to Celtic's insureds.  TeamHealth received and appreciated those benefits; it was aware that Celtic was making payments to it for services purportedly rendered.

196.    Retention of this benefit by TeamHealth would be unjust and inequitable, because the amount of the payment in many cases greatly exceeds the value of the service for which it was supposedly made, namely, provision of medical services to Celtic's insureds.

197.    Celtic is not in contractual privity with TeamHealth.  There is therefore no means for Celtic to secure contractual recovery of the benefits it has conferred on TeamHealth.  Any attempt to seek recovery of Celtic's losses from the parties with whom Celtic is in contractual

58

privity, i.e., Celtic's insureds or the hospitals, would be unjust because Celtic's insureds who seek treatment in emergency rooms have little control over which ER doctor they see and have no control over how their claims are coded, and neither the patients nor the hospitals receive the overpayment that TeamHealth extracted from Celtic via its coding schemes.

## PRAYER FOR RELIEF

**WHEREFORE**, Celtic respectfully requests that the Court grant the following relief:

(i)     Enter judgment in favor of Celtic on all counts of this Complaint;

(ii)     Award Celtic money damages, including compensatory damages and punitive/exemplary damages, in an amount to be proven at trial, of at least $100,000,000, including but not limited to:

      a.   treble damages pursuant to RICO, 18 U.S.C. § 1965(c), or as otherwise permitted by law;

      b.   threefold the economic damages that TeamHealth attempted to cause Celtic through TeamHealth's fraudulent acts pursuant to Tenn. Code Ann. § 56-53-107(c);

      c.   a penalty within the statutory range of $100–$10,000 for each fraudulent insurance claim that TeamHealth submitted to Celtic pursuant to Tenn. Code Ann. § 56-53-107(b)(1)(E);

(iii)     Enter a permanent injunction requiring TeamHealth to alter its current policies regarding upcoding, retrain its coding staff to properly code medical claims rather than systematically upcode medical claims, and submit to a regular, at least yearly, audit of its coding practices by an independent monitor, with all costs of such audit to be paid by TeamHealth;

59

(iv)    Award Celtic its costs, expenses, and reasonable attorney's fees incurred in this action, pursuant to 18 U.S.C. § 1965(c), Tenn. Code Ann. § 56-53-107(a)(1)(B), Tenn. Code Ann. § 56-53-107(b)(1)(B), or as otherwise permitted by law;

(v)    Award Celtic pre- and post-judgment interest to the maximum extent permitted by law;

(vi)    Award such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Celtic requests a jury trial of all issues properly triable by jury.

Dated:  December 10, 2020

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By:    */s/ Steven M. Cady*
Brendan V. Sullivan, Jr.*
C. Bryan Wilson*
Steven M. Cady*
725 Twelfth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 434-5000
bsullivan@wc.com
bwilson@wc.com
scady@wc.com
* Pro hac vice motions forthcoming

BROCK SHIPE KLENK PLC

By:    */s/ W. Edward Shipe*
W. Edward Shipe (BPR #023887)
265 Brookview Centre Way, Suite 604
Knoxville, Tennessee 37919
Telephone: (865) 338-9700
eshipe@bskplc.com

*Attorneys for Plaintiff Celtic Insurance Company*

60